# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | Case No. 1:21cr022 |
| | : | |
| Plaintiff, | : | **JUDGE BARRETT** |
| v. | : | |
| | : | |
| **HANANIAH REED,** | : | |
| | : | |
| Defendant. | : | |

## OPINION & ORDER

This matter is before the Court on Defendant's Motion to Suppress. (Doc. 22). The Government filed a Response in Opposition. (Doc. 24). The Court conducted an evidentiary hearing on August 17, 2021 (Docs. 28, 29), and the parties submitted post-hearing briefs (Docs. 30, 31, 32).

### I. BACKGROUND

The following facts were revealed at the evidentiary hearing at which the Court heard testimony from Cincinnati Police Department ("CPD") Sergeant ("Sgt.") Brendon Rock, Sgt. John Dotson, Officer Brandon Dean, and Officer Rasheen Jennings. (Doc. 29). The Court also received the Government's Exhibits 1-4 and 6-9 into evidence. (Doc. 28-1); (PX 1-4, 6-9).

On December 29, 2020, Sgt. Rock was the supervisor for the CPD's District 4 Violent Crime Squad and responded, in plainclothes and driving an unmarked car, to a call regarding an armed man in the vicinity of the apartment building located at 3652 Reading Road Cincinnati, Ohio 45229 who was scaring neighbors. (Doc. 29 PageID 82-84, 108). The description of the suspect given to the CPD was a male, Black,

thirties, dreads, wearing a black hoodie, and armed with a black handgun. (*Id.* PageID 83). As Sgt. Rock pulled up in front of the apartment building, he observed Defendant—who matched the radioed description in that he was a Black male in the described area with dreads and wearing a black jacket—standing in front of the building. (*Id.* PageID 84, 116). Sgt. Rock thought Defendant appeared to be agitated, and observed Defendant get into the driver's seat of a vehicle parked in front of the apartment building, and Sgt. Rock's vehicle, give Sgt. Rock "the [middle] finger," fail to signal, pull away from the curb, make a U-turn, and drive southbound on Reading Road. (*Id.* PageID 84-85). Sgt. Rock radioed his observations of Defendant's travel to his fellow officers. (*Id.* PageID 87).[1]

On December 29, 2020, Sgt. Dotson was assigned to the CPD's District 4 First Relief squad and responded, in uniform and as a passenger in a marked police cruiser, to the call regarding an armed man in the vicinity of 3652 Reading Road and Sgt. Rock's radioed description of Defendant driving southbound on Reading Road. (*Id.* PageID 92-93). Sgt. Dotson and his partner drove to the area to assist with stopping and apprehending Defendant. (*Id.* PageID 93). In doing so, Sgt. Dotson observed Defendant drive his vehicle through an intersection without stopping at a stop sign, continue to drive at a high speed, jump from the moving vehicle, and flee on foot. (*Id.* PageID 94). Sgt. Dotson then observed the now-unoccupied, but nonetheless moving, vehicle that Defendant deserted crash into another car. (*Id.*) Sgt. Dotson immediately exited his police

---

[1] Sgt. Rock's observations regarding Defendant's vehicle's travel are confirmed by his body cam video. (Doc. 29 PageID 87); (PX1 Sgt. Rock's Body Camera Video).

cruiser, after safely pulling into a parking lot, and chased Defendant on foot.[2] (*Id.* PageID 95).

During his foot pursuit of Defendant, Sgt. Dotson chased Defendant over two fences and kept Defendant in sight while doing so. (*Id.* PageID 95-96). On the other side of the second fence, there was a house—located at 723 Chalfonte Place Cincinnati, Ohio 45229—with a porch elevated above ground-level that Sgt. Dotson observed Defendant go up on, proceed off of, and travel northbound through other homes' yards. (*Id.*) Sgt. Dotson did not go on the porch at the same time as Defendant, as Sgt. Dotson was scaling the second fence at the time that Defendant was on the porch. (*Id.*) After Sgt. Dotson got over the second fence, he did not follow Defendant through the other homes' yards and lost sight of Defendant. (*Id.* PageID 102). Sgt. Dotson remained in the area around 723 Chalfonte Place until other officers apprehended Defendant. (*Id.* PageID 102-03).

On December 29, 2020, Officers Dean and Jennings were officers assigned to the CPD's District 4 Violent Crime Squad and responded, in plainclothes, to the call regarding an armed man in the vicinity of 3652 Reading Road and subsequent radio communications that Defendant fled on foot. (*Id.* PageID 107-09, 119). Officers Dean and Jennings ultimately responded to an apartment building located at 3654 Alter Place Cincinnati, Ohio 45229. (*Id.* PageID 109). Upon their arrival at 3654 Alter Place, Officers Dean and Jennings found other CPD officers, and individuals who lived in the area who told the officers that they saw someone running and that the runner went to the second floor of 3654 Alter Place. (*Id.* PageID 110). Officers Dean and Jennings started setting a

---

[2] Sgt. Dotson's body cam became detached from his uniform, while he was scaling a fence, during his foot pursuit of Defendant. (Doc. 29 PageID 96); (PX2 Sgt. Dotson's Body Camera Video #1).

perimeter around that building and informed other officers that Defendant was possibility inside. (*Id.*) After establishing a perimeter, Officers Dean and Jennings found Defendant on the second floor of that building and took him into custody at 13:29:58 hours. (*Id.*) Defendant was not armed at the time of his arrest. (PX4 Officer Dean's Body Camera Video at 0:00:30-0:04:15).[3]

Officer Dean advised Defendant of Defendant's *Miranda*[4] rights immediately after removing Defendant from 3654 Alter Place and immediately before placing Defendant in a marked police cruiser and another officer transported Defendant to District 4 Headquarters to be interviewed. (Doc. 29. PageID 110-11); (PX4 at 0:05:40-0:06:15, 0:06:16-0:11:55). At the time that Officer Dean read Defendant's *Miranda* rights, Defendant appeared out-of-breath, but coherent and alert. (Doc. 29 PageID 111, 120); (PX4 at 0:04:15-0:06:15). Also, at the time that Officer Dean read Defendant's *Miranda* rights, Defendant stated that he understood those rights. (PX4 at 0:05:40-0:06:15).

Additionally, after Officers Dean and Jennings apprehended Defendant, Sgt. Dotson discovered a black firearm inside a grill on the porch of 723 Chalfonte Place at 13:31:55 hours. (Doc. 29 PageID 96); (PX3 Sgt. Dotson's Body Camera Video #2 at 0:02:59). Sgt. Dotson requested that other officers recover the firearm, and they did so. (Doc. 29 PageID 99).

Subsequently, and at District 4 Headquarters, Officer Jennings interviewed Defendant. (*Id.* PageID 113).[5] When Officer Jennings began the interview, Defendant appeared to be more out-of-breath than he was at the time of his arrest and stated that

---

[3] Officer Dean's testimony of the above is confirmed by his body cam video. (PX4 at 0:00:30-0:04:15).
[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).
[5] Officer Dean was present for some of the interview, but not the entire interview. (Doc. 29 PageID 113, 120, 128-29).

his chest hurt. *Compare* (PX6 Interview Video #1), *with* (PX4). In response, Officer Jennings informed Defendant that Officer Jennings spoke with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and that ATF was interested in "taking this case federal," Defendant had the opportunity to tell his side of the story, and Defendant had "an opportunity, not to be taken federal, maybe stay on the state, state-side."[6] (PX6 at 0:00:15-0:00:35). Officer Jennings then noted Defendant's criminal record and asked Defendant if there is any reason that Defendant's DNA would come back on the recovered firearm, if Defendant had the firearm for protection, and if Defendant was "beefing" with someone. (*Id.* at 0:00:36-0:00:57). In response, Defendant asked for a minute alone, and Officer Jennings accommodated Defendant's request and left Defendant alone in the interview room. (*Id.* at 0:00:58-0:01:48).

When Officer Jennings returned to the room, after about 10 minutes, and resumed the interview, Officer Jennings again asked Defendant if Defendant had the firearm for protection. (Doc. 29 PageID 123); (PX7 Interview Video #2 at 0:00:00-0:00:18). Defendant responded through labored breath. (PX7 at 0:00:19-0:00:29). Officer Jennings then again asked Defendant if Defendant had a "beef" with someone and if that "beef" is why Defendant had the firearm. (*Id.* at 0:00:46-0:00:48). Defendant responded through less-labored breath than his last response to Officer Jennings. (*Id.* at 0:00:49-0:00:53).

Officer Jennings then asked Defendant to confirm that the recovered firearm is Defendant's, and Defendant did not answer. (*Id.* at 0:00:54-0:02:01). Officer Jennings then asked Defendant if Defendant threw the firearm while Defendant was running from officers, and Defendant did not answer. (*Id.* at 0:02:02-0:02:21). In response, Officer

---

[6] Officer Jennings testified that he, in fact, had not spoken with ATF and that relaying that information to Defendant was an interview technique. (Doc. 29 PageID 124).

5

Jennings then told Defendant that Officer Jennings would let "them" know to take Defendant "federal" and that Defendant would probably deal with the U.S. Marshals Service later that evening. (*Id.* at 0:02:22-0:02:27). In response, Defendant immediately asked Officer Jennings if Officer Jennings was taking Defendant "federal." (*Id.* at 0:02:28-0:02:29). Officer Jennings replied that he was. (*Id.* at 0:02:29-0:02:37). Officer Jennings then informed Defendant that Defendant had "the chance to take it on the state-side." (*Id.* at 0:02:38-0:02:43). Officer Jennings emphasized that the firearm would be checked for DNA and fingerprints before he again asked Defendant if the firearm was Defendant's. (*Id.* at 0:02:44-0:03:09). Defendant responded, clearly, "yeah." (*Id.* at 0:03:10-0:03:11). In response, Officer Jennings said, "fair enough, we'll keep it on the state-side." (*Id.* at 0:03:12-0:03:17).

A one-count indictment in this federal court charges Defendant with possession of a firearm and ammunition by a convicted felon in violation of 18 U.S.C. § 922(g)(1). (Doc. 7). Defendant moves to suppress any and all evidence seized regarding the firearm and ammunition, and any statements that he made concerning ownership of those items, on December 29, 2020. (Docs. 22, 30, 32).

## II. ANALYSIS

### a. Seizure

Defendant first argues that officers violated his constitutional rights on December 29, 2020, as they did not have a warrant to stop and detain him and no exception to the warrant requirement applies. (Doc. 22 PageID 50-54); (Doc. 30 PageID 135, 138); (Doc. 32 PageID 151-52).

The Fourth Amendment to the U.S. Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

"An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009) (citing *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)); *accord Whren v. United States*, 517 U.S. 806, 810 (1996) ("As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."); *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005) ("We have long held that 'so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment.'" (citing *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996))).

Here, Sgt. Rock testified that he observed Defendant get into a vehicle, fail to signal, pull away from the curb, make a U-turn, and drive away. (Doc. 29 PageID 84-85). He testified that such a U-turn is illegal. (*Id.* PageID 85). He further testified that he radioed his observations to his fellow officers. (*Id.* PageID 87). Sgt. Dotson testified that he heard Sgt. Rock's description of Defendant's vehicle, and observed Defendant drive his vehicle through an intersection without stopping at a stop sign, continue to drive at a high speed, jump from the moving vehicle, and flee on foot. (*Id.* PageID 93-94). Sgt. Dotson then testified about his resulting chase of Defendant. (*Id.* PageID 94-96). Sgt. Dotson also

7

testified that running a stop sign, traveling at a high rate of speed at the specific location near Reading Road, and exiting a car that is still moving are all traffic violations. (*Id.* PageID 94-95, 99-100).

Sgt. Rock's and Sgt. Dotson's testimony regarding their observations on December 29, 2020, including of Defendant running over the porch where the firearm was recovered two minutes after Defendant's arrest, is credible, and they are competent to testify against him as witnesses. *Cf. United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012) ("It is well-established that an officer may conduct a stop based on information obtained by fellow officers."); *Columbus v. Ridley*, 2015-Ohio-4968, ¶ 8, 50 N.E.3d 934, 936 (Ohio Revised Code § 4549.16 did not prevent the officers from testifying because the officers testified credibly regarding their duties on the date of the appellant's arrest and the officers were not on duty for the exclusive or main purpose of enforcing traffic laws); Ohio Rev. Code § 4549.16 ("Arresting officer as witness"). Also, on December 29, 2020, Defendant was cited for reckless operation of a vehicle in violation of Cincinnati Municipal Code 506-6; failure to control in violation of Ohio Revised Code § 4511.202; leaving the scene of an accident in violation of Ohio Revised Code § 4549.02; and driving under suspension in violation of Ohio Revised Code § 4510.16. (PX8, PX9). Defendant's ultimate arrest was the result of probable cause that CPD officers had based on the observed and cited traffic violations discussed above. *See Bell*, 555 F.3d at 539; *Blair*, 524 F.3d at 748; *Davis*, 430 F.3d at 352; *Bradshaw*, 102 F.3d at 210; *cf. Whren*, 517 U.S. at 810.

### b. Statements

Defendant next argues that the Court must suppress all of the statements that he made during his interview with Officer Jennings at District 4 Headquarters, as Officer Jennings made several promises of leniency that were coercive as they were broken and/or illusory. (Doc. 22 PageID 50, 54-56); (Doc. 30 PageID 139-140); (Doc. 32 PageID 152-53).

The Fifth Amendment to the U.S. Constitution provides, among other things, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Fifth Amendment, along with the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, also requires that a confession be voluntary to be admitted into evidence. *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004); *Dickerson v. United States*, 530 U.S. 428, 433 (2000).

"[T]he success of a criminal investigation often hinges on obtaining information from uncooperative individuals." *Williams v. Withrow*, 944 F.2d 284, 289 (6th Cir. 1991), *aff'd in part, rev'd in part*, 507 U.S. 680 (1993). "[E]ffective interrogation techniques require, to some extent, a carrot-and-stick approach to eliciting information from an uncooperative suspect." *Id.* "In determining whether a confession has been elicited by means that are unconstitutional, this court looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." *United States v. Johnson*, 351 F.3d 254, 260 (6th Cir. 2003) (quoting *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999); *accord Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). "In determining whether a confession is involuntary due to police coercion, this Court has three

9

requirements that must be met: '(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement.'" *United States v. Siler*, 526 F. App'x 573, 575 (6th Cir. 2013) (quoting *Mahan*, 190 F.3d at 422). With respect to the first *Mahan* requirement, "promises of leniency may be coercive if they are broken or illusory."[7] *Johnson*, 351 F.3d at 262. "Furthermore, a promise is problematic if a police officer leads a defendant to believe that he 'will receive lenient treatment when this is quite unlikely,' and makes a promise, without authorization by the prosecution." *Siler*, 526 F. App'x at 575 (quoting *United States v. Little*, 9 F.3d 110 (6th Cir.1993)).

Here, at the beginning of Officer Jennings's interview of Defendant, Officer Jennings immediately informed, albeit misleadingly, Defendant that ATF was interested in taking the matter "federal." (PX6 at 0:00:16-0:00:21). Officer Jennings then informed Defendant that Defendant had "an opportunity, not to be taken federal, maybe stay on the state, state-side." (PX6 at 0:00:22-0:00:34). Officer Jennings's statement regarding "maying stay[ing] on the state[]-side," at the beginning of the interview, was not a coercive promise of leniency. *See Siler*, 526 F. App'x at 575-76; *Williams*, 944 F.2d at 289. Rather, his "maybe" statement is more akin to a permissible promise to recommend leniency or speculation that cooperation will have a positive effect. *See, e.g.*, *United States v. Montgomery*, 491 F. App'x 683, 687 (6th Cir. 2012).

---

[7] "[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." *Johnson*, 351 F.3d at 262 n.1.

10

Later in the interview, Defendant remained silent for minute-and-a-half in response to two of Officer Jennings's questions. (PX7 0:00:54-0:02:01, 0:02:01-0:02:21). In response to Defendant's minute-and-a-half of silence, Officer Jennings told Defendant that Officer Jennings would let "them" know to take Defendant's case "federal." (*Id.* at 0:02:22-0:02:28). Defendant immediately asked Officer Jennings if Officer Jennings was taking Defendant "federal," and Officer Jennings confirmed that he was. (*Id.* at 0:02:28-0:02:37). Officer Jennings, however, then told Defendant that Defendant had "the chance to take it on the state-side," and emphasized that the firearm would be checked for DNA and fingerprints. (*Id.* at 0:02:38-0:02:45, 0:02:46-0:03:04).

Although this was not a lengthy back-and-forth exchange between the officers and suspects as in *Williams* or *Siler*, the Court finds the first *Mahan* requirement to be determinative and that, at this point in the interview, Officer Jennings's statement about Defendant's "chance to take it on the state-side," was a coercive promise of leniency. *See Siler*, 526 F. App'x at 575-76. At this time, Officer Jennings made clear to Defendant that *if* Defendant cooperated with Officer Jennings, *i.e.*, if Defendant told Officer Jennings that the recovered firearm was Defendant's, *then* Defendant's case would stay "stateside" *i.e.*, Defendant would not be indicted federally. It is evident that Officer Jennings's promise, at this point in the interview, induced Defendant's confession. *See id.* at 575-76; *Williams*, 944 F.2d at 289. Further, Officer Jennings broke his promise when he turned Defendant over to federal prosecutors who charged Defendant with a weapons violation. *See Siler*, 526 F. App'x at 576. The Court also finds that the coercive statement overbore Defendant's will and was the crucial motivating factor in Defendant's decision to confess to ownership of the recovered firearm. *See id.*; *Mahan*, 190 F.3d at 422. Thus, at this

11

point in the interview, the Court finds Defendant's confession to be involuntary and inadmissible. The Court, accordingly, will grant Defendant's Motion to Suppress, but only as it relates to Defendant's statements after 0:02:37 on Plaintiff's Exhibit 7.

### III. CONCLUSION

Based on the foregoing, it is hereby **ORDERED** that Defendant's Motion to Suppress (Doc. 22) is **GRANTED in part** and **DENIED in part**.

**IT IS SO ORDERED.**

_/s Michael R. Barrett_____
Michael R. Barrett, Judge
United States District Court